UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re: | ) | Chapter 11 |
|---|---|---|
| | ) | |
| THE CARLISLE APARTMENTS, L.P., | ) | Case No. 10-_____ |
| | ) | |
| Debtor. | ) | |
| | ) | |

## LOCAL RULE 1007-2 AFFIDAVIT

State of New York  )
                   ss.:
County of New York )

Marc Schulder, being duly sworn deposes and states:

1. I am an employee of Real Estate Capital Partners Limited Partnership ("RECP"), a Delaware limited partnership. In that capacity, I am responsible for, among other things, certain investments of two Delaware limited partnerships – RECAP Investments XI - Fund A, L.P. ("Fund A") and RECAP Investments XI - Fund B, L.P. ("Fund B" and, together with Fund A, the "Carlisle Limited Partner"). The sole general partner of both Fund A and Fund B is RECAP XI GP, Inc., a Delaware corporation ("RECP XI GP"). Carlisle Limited Partner made an equity investment in a 372-unit development apartment project located in Charlotte, North Carolina (the "Property") owned by The Carlisle Apartments, L.P., a Delaware limited partnership (the "Debtor"), having Carlisle GP, Inc., a Delaware corporation ("Carlisle GP") as its general partner. The principal place of business of each of Carlisle Limited Partner, RECP XI GP, the Debtor., and Carlisle GP is New York, NY.

2. I submit this affidavit pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") in support of

the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code, (the "Bankruptcy Code"), filed contemporaneously herewith.

3. Except as otherwise indicated, the facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and/or property management firms working under my supervision, information provided by a previous general partner to the Debtor, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operation and its history. I am authorized to submit this affidavit on behalf of the Debtor, and if called to testify, I would testify competently to the facts set forth herein. Unless otherwise indicated, any financial information contained in this affidavit or the exhibits annexed hereto are unaudited and presented on an estimated basis.

**Ownership Structure of the Debtor**

4. RECP is a real estate investment advisor that forms funds that are currently invested in a portfolio of commercial real estate properties across the United States worth approximately $5 billion. This portfolio includes development joint ventures, sponsor level development, and ongoing asset management deals.

5. RECP owns 100% of the outstanding and issued stock of RECP XI GP, which is the sole managing general partner of Fund A and is also the sole managing general partner of Fund B. The limited partners of Fund A and Fund B are various individual and institutional investors. Fund A and Fund B are limited partner investors in the Debtor. RECP owns 100% of the outstanding and issued stock of Carlisle GP, which, as of November 12, 2010, is the general partner of the Debtor.

**History of the Debtor**

6.  The Debtor was formed on or about January 2, 2008, pursuant to that certain Limited Partnership Agreement of the Debtor (the (the "LPA") by and among McCullough Harris LLC, a North Carolina limited liability company ("McCullough Harris"), and Carlisle Limited Partner, as its only partners, for the purposes of, inter alia, owning, developing, constructing, improving, operating, leasing, managing, financing, refinancing, holding, selling, and otherwise dealing with the Property. The Property is currently called "Phillips University Center." The goal of the Debtor as set forth in the LPA is to maximize the partners' return on their investments in the project, and thus maximize the recovery for all stakeholders of the Debtor.

7.  McCullough Harris was created for the purposes of acting as the general partner of the Debtor (and hence, defined as the "General Partner" in the LPA). McCullough Harris operates out of the offices of a Tampa, Florida-based real estate developer named Phillips Development & Realty ("PDR"). Donald Phillips ("Phillips") is the founder and Managing Director of PDR.

8.  Pursuant to the LPA, Carlisle Limited Partner (defined in the LPA as the "Investor Partner"), was the initial sole limited partner of the Debtor and McCullough Harris was the original sole general partner of the Debtor.

9.  Carlisle Limited Partner contributed $8,667,000 in initial capital to the Debtor, which was 90% of the total initial equity contributed by the partners. McCullough Harris contributed $963,000 in initial capital to the Debtor, which was 10% of the total initial equity contributed by the partners.

10.     In addition, the Debtor's acquisition, development, and construction of the Property was financed by an approximately $32.4 million construction loan (the "Loan") from Compass Bank (Alabama) ("Compass") pursuant to a Construction Loan Agreement dated as of January 2, 2008, by and between the Debtor, as Borrower, and Compass, as Lender (the "Loan Agreement") and an accompanying Note also dated January 2, 2008. The maturity date of the Loan is on or about January 2, 2011 (the "Maturity Date"). McCullough Harris and Phillips guaranteed payment of the Loan. Carlisle Limited Partner executed a conditional springing guarantee, contingent upon, among other things, it or an affiliate becoming the General Partner.

11.     The Loan, like most construction loans, is interest-only. Accordingly, up until the Maturity Date, the Debtor pays only interest on the Loan to Compass and, on the January 2011 maturity date, the principal amount is due to Compass. The current Loan balance is $32,018,810.[1]

## EVENTS LEADING UP TO THE BANKRUPTCY

**McCullough Harris Ignores Requests To Seek An
Extension To The Loan Agreement**

12.     In February or March 2010, Carlisle Limited Partner realized that, based on, among other things, the income-to-debt ratio on the Property, the Debtor was not likely to meet the requirements to trigger the Debtor's option to renew the Loan pursuant to the various renewal options in the Loan Agreement. Nevertheless, Carlisle Limited Partner believed that some sort of renewal to or extension of the Loan was necessary to maximize the value of the Property (and, necessarily, the Debtor), and anticipated that while construction completion might be achieved prior to the Maturity Date, stabilization would not be achieved. Specifically, Carlisle

---

[1] There is an interest rate swap connected with the Loan. If the Loan is paid prior to the swap maturity of Jan 2012, then there would be a breakage cost. That cost will change depending upon the current interest rate market and the time remaining - therefore, it changes daily. We believe that it is currently approximately $1 million.

Limited Partner believed that seeking a short-term extension of the Loan (anywhere from six months to two years) would allow the Property's operations to stabilize (primarily through increased occupancy and reduction of rent discounts) and allow time for the overall real estate market to rebound.

13. Carlisle Limited Partner therefore believed it was extremely important that the Debtor reach an agreement on an extension of the Loan. The Loan is a mortgage loan, and therefore, if the Loan is not extended and it is not repaid in full by the Maturity Date, Compass is permitted to foreclose on the Property and assume ownership thereof in a non-judicial proceeding. In the event of a foreclosure, Carlisle Limited Partner and all the investors it represents, could lose its entire $8,667,000 capital investment in the Property, and there would be no means to pay general unsecured creditors.

14. In the real estate market, multi-family rental properties like the Property at issue here, are considered "stabilized" when occupancy levels are above 90%. This is, in part, due to the fact that such properties in North Carolina qualify for Fannie Mae or Freddie Mac financing (among the most generous financing available) only once they have achieved 90% occupancy for 90 days.

15. In the event that the Loan could not be extended, Carlisle Limited Partner required sufficient time to obtain alternate financing, raise additional capital, or locate a buyer for the Property in order to maximize value for all stakeholders.

16. In light of the upcoming Maturity Date and the Debtor's inability to exercise its Loan renewal options under the Loan Agreement, on March 9, 2010, Phillips, the principal of McCullough Harris, was contacted by Carlisle Limited Partner and asked, in his capacity as principal of the general partner to the Debtor, to approach Compass about agreeing to an

extension of the Loan. Phillips rejected the request, and instead expressed a desire to delay approaching Compass about an extension, believing that requesting an extension nearer to the Maturity Date would garner better results. Further, despite his fiduciary duty to the Debtor, Phillips informed Carlisle Limited Partner that he had other loans with Compass for other real estate development deals, and that he could not do anything with respect to the Loan that would jeopardize his other loans.

17. Over the next few months, Carlisle Limited Partner repeatedly contacted Phillips to urge to include Carlisle Limited Partner in negotiations with Compass concerning extending the Loan. Phillips repeatedly ignored these requests. Moreover, in several communications between Phillips and Carlisle Limited Partner throughout September and October 2010, Phillips insisted that Compass would not agree to an extension of the Loan. During this period, as Carlisle Limited Partner subsequently learned, Phillips actually was conducting negotiations with Compass to purchase the Loan with third party buyers. However, Phillips never informed Carlisle Limited Partner about these negotiations and delayed scheduling any joint calls with Compass until the middle of November.

**The Debtor Sues Compass Without Carlisle Limited Partner's Knowledge**

18. On September 23, 2010, without seeking Carlisle Limited Partner's consent and, indeed, without its knowledge, McCullough Harris, on behalf of the Debtor, filed a lawsuit against Compass in Florida state court. In addition to the Debtor, Phillips caused suit to be brought on behalf of the limited partnerships of other real estate developments in which he was involved. Carlisle Limited Partner did not learn about the lawsuit until November 5, 2010, and then, only through its own title search of the Property. McCullough Harris' filing of this lawsuit clearly breached Section 10.4(h) of the LPA, which prohibits McCullough Harris, as the general

partner, from prosecuting any causes of action on behalf of the Partnership against third parties without the express approval of RECAP Limited Partner.

19. In connection with this Florida lawsuit, McCullough Harris, on behalf of the Debtor, also filed a lis pendens on the Property in Mecklenberg County, North Carolina. This act also breached Section 10.4(d) of the LPA, which prohibits McCullough Harris, as the general partner, from encumbering the property without the express approval of Carlisle Limited Partner.

**Other Breaches By McCullough Harris**

20. At some point subsequent to the execution of the LPA, the Debtor learned that McCullough Harris, without the approval of Carlisle Limited Partner required under the LPA:

   a. entered into a swap agreement with Compass fixing the interest rate for the Loan;

   b. paid property management fees from the Debtor to a Phillips affiliate in excess of that allowed under the LPA; and

   c. failed to provide the Debtor with a copy of a management agreement for the Property (or else failed to enter into a signed management agreement for the Property).

21. Moreover, Carlisle Limited Partner later learned that McCullough Harris continually misrepresented or omitted the status and content of its negotiations with Compass regarding the Loan and improperly attempted to link such negotiations with negotiations concerning Phillips's loans unrelated to the Partnership's Loan.

**McCullough Harris Continues To Operate Only In Phillips's Best Interests**

22. On September 28, 2010, without any advance notice, McCullough Harris sent Carlisle Limited Partner a letter seeking a capital call in the amount of $11,350,000 ($5,675,000

from each of McCullough Harris and Carlisle Limited Partner). In the capital call notice, Phillips stated that the rationale for the additional capital infusion was that Compass intended to sell the Loan. Further, because, purportedly, the maximum financing the Debtor could achieve was approximately $22 million and the outstanding principal on the Loan was approximately $33 million including the unauthorized swap breakage cost, McCullough Harris deemed it necessary to have $11,350,000 available to satisfy the Loan immediately. Carlisle Limited Partner was not obligated to meet this capital call under the LPA and therefore did not do so. The Loan was not in default, and therefore, even if the Note was sold, repayment would not be due until the Maturity Date. Carlisle Limited Partner later learned that McCullough Harris did not have the means to meet the capital call itself; so the entire exercise had been spurious and apparently designed to manufacture claims against Carlisle Limited Partner.

23. On Monday, October 11, 2010, Phillips asked for Carlisle Limited Partner's permission to engage a broker to sell the Property immediately. Carlisle Limited Partner refused to approve any effort to sell the Property until the Debtor – with the participation of Carlisle Limited Partner – first spoke with Compass about an extension to the Loan. Carlisle Limited Partner believed that a sale at that time would not have maximized the Property's value. As of the date of Phillips' request, the Property was near, but had not quite reached, 90% occupancy. Accordingly, it was believed that a short extension of six to twelve months would enable the Property to reach "stabilization" and therefore increase financing opportunities and thereby maximize the sale price. Phillips agreed to speak to Compass. However, despite repeated

urging, and despite Carlisle Limited Partner's approval rights under the LPA,[2] Phillips never included Carlisle Limited Partner in any discussions with Compass.

**Carlisle GP Takes Over As General Partner**

24. Due to McCullough Harris' multiple breaches of the LPA (including, the unauthorized filing of the lawsuit against Compass in Florida, the unauthorized filing of the lis pendens, and McCullough Harris' deceit and breaches of fiduciary duty, Carlisle Limited Partner was entitled to remove McCullough Harris as general partner of the Debtor. Compass urged Carlisle Limited Partner to do so. Specifically, on November 12, 2010, citing relevant provisions of the LPA permitting such action, Carlisle Limited Partner sent notice to McCullough Harris and its principal, Phillips, that, among other things, it was converting McCullough Harris' general partnership interest in the Debtor into that of a limited partner without any rights or obligations to participate in the management of the Debtor and without any approval rights under the LPA, and that Carlisle Limited Partner had appointed Carlisle GP, Inc. to be the new general partner of the Debtor.

25. The notice demanded that McCullough Harris immediately cooperate with the transfer of all keys, security codes, and necessary records for the day-to-day operations of the Property. Further, pursuant to Section 18.1 of the LPA, McCullough Harris was required to transfer all information to control the Debtor's bank accounts; all leases, contracts, and warranties related to the Property; all maintenance records related to the Project; and all books and records of the Debtor and the Property. Carlisle GP is still waiting for some of their information.

---

[2] Specifically, McCullough Harris was not authorized to enter into any loan modification or extension without Carlisle Limited Partner's written approval. (*See* LPA § 10.4(e).)

26. That same day, Carlisle GP contacted Ovation Property Management, LLC ("Ovation"), the property manager for the Property controlled by Phillips, and informed it that any management agreement between it and McCullough Harris had been terminated. Carlisle GP replaced Ovation with GREP Southeast, LLC ("GREP"), one of the largest apartment management companies in the country.

27. McCullough Harris and Phillips disputed Carlisle GP's entitlement to act as general partner and again in violation of the LPA, commenced suit in the Mecklenburg County Superior Court in Charlotte, North Carolina, encaptioned *The Carlisle Apartments, L.P. and McCullough Harris, LLC v. RECAP Investments XI - Fund A, L.P. and RECAP Investments XI - Fund B, L.P., Carlisle GP, Inc. and GREP Southeast, L.L.C.*, Case No. 10-cvs-23038, seeking a temporary restraining order restraining Carlisle GP from taking over as general partner, which was denied by the court.

28. Replacing the General Partner was a significant step for Carlisle Limited Partner as, arguably, it could trigger Carlisle Limited Partner's guarantee of the Loan. Carlisle Limited Partner, therefore, was not incentivized to replace the General Partner unless absolutely necessary to preserve and maximize value.

29. As it considered replacing the General Partner, Carlisle Limited Partner asked three prominent real estate brokers to prepare opinions of value of the Property. Each of the three valuations showed a value considerably in excess of the Loan, indicating to Carlisle Limited Partner that there was significant value to be preserved for other stakeholders.

**Negotiations with Compass**

30. Starting in October, 2010, Compass began encouraging Carlisle Limited Partner to remove McCullough as general partner. Once Carlisle Limited Partner did Compass's

bidding, however, and arguably became liable under the contingent guarantee, Compass changed its tune. By the middle of November, 2010, subsequent to the denial of McCullough Harris' motion for a TRO, Compass was conditioning negotiations on McCullough Harris being a party to those negotiations despite Carlisle GP's clear rights to act as general partner under the LPA.

31. On November 15, 2010, Carlisle GP and Carlisle Limited Partner sought a temporary restraining order and preliminary injunction against McCullough Harris in the District Court for the Southern District of New York to prevent McCullough Harris from interfering with Carlisle GP's exercise of control over the Debtor. The relief sought by Carlisle GP included (i) a declaratory judgment confirming Carlisle GP's right to act as general partner of the Debtor; (ii) a permanent injunction enjoining McCullough Harris from interfering with Carlisle GP's performance as general partner of the Debtor; and (iii) a mandatory injunction requiring any necessary cooperation from McCullough Harris. On November 23, 2010, the District Court granted the temporary restraining order and ordered McCullough Harris (i) to turn over the books, accounts, and records of the Debtor to Carlisle GP and (ii) to refrain from any act of interference with the operation or management of the Debtor's affairs as administered by Carlisle GP as the "new general partner" or to otherwise take action inconsistent with McCullough Harris' obligations under the LPA. The District Court set bond at $100,000 despite McCullough Harris' pleading for $32,400,000. Carlisle Limited Partner and Carlisle GP posted the required bond shortly thereafter.

32. Carlisle GP continued to attempt negotiations with Compass for an extension of the Loan. Eventually, Compass issued a formal proposal to Carlisle GP to restructure the Loan. The proposal had an unreasonably short time frame, but more significantly, required that Phillips no longer be connected in any way to the Debtor. This provision gave Phillips tremendous

leverage, and indeed, Phillips attempted to use this to leverage money from Carlisle GP in exchange for him giving up his interest in the Debtor. Carlisle Limited Partner has learned that Phillips had successfully used this ploy in another matter.

33. The Debtor continued to express its frustration about this and other issues to Compass. On December 21, 2010, Carlisle GP formally requested that Compass eliminate its condition on any restructuring of the Loan that Phillips be removed as a limited partner from the Debtor, as, it would require significant sums that could better be used to pay down the Loan.

34. Without warning, on December 22, 2010, Compass informed Carlisle GP that its offer was withdrawn and that the Loan was to be paid in full on or before January 11, 2011. On December 23, 2010, Carlisle GP was informed by Compass that Compass intended to sell the Loan to a Phillips-related entity if the entity could pay the agreed price by year end. As a result, Compass was not interested in further discussion about restructuring.

35. On the same day, a business person working with Phillips called to say that an affiliate of Phillips was planning to buy the Note and that Carlisle Limited Partner and Carlisle GP must either pay Phillips $2.5 million to relinquish his equity in the Debtor, or, in the alternative, pay Phillips $450,000 and Carlisle Limited Partner relinquished its equity in the Debtor, and Carlisle GP relinquish its control of the Debtor.

36. Carlisle GP also recently learned that notwithstanding the removal of McCullough Harris as general partner of the Debtor on November 15, 2010, Phillips and McCullough Harris continue to have dominion and control over the Debtor's bank accounts held at Compass, allegedly with Compass' acquiescence. Although Carlisle GP timely informed Compass that it had replaced McCullough Harris as general partner and that McCullough Harris and Phillips no longer had authorization to act on behalf of the Debtor, Compass continues to allow McCullough

and Phillips to withdraw funds without the consent or participation of Carlisle GP, including funds payable to both PDR and Compass.

37. Faced with the real threat that Phillips and McCullough Harris may drain the Debtor's cash resources, the Loan coming due imminently, no counterparty willing to negotiate and a blatant extortion attempt, Carlisle GP and the Debtor determined that filing for relief under Chapter 11 of the Bankruptcy Code was the only viable option to preserve the value of the Property, prevent foreclosure, and maximize value for all stakeholders.

**Local Rule 1007(a)(3)-(12); 1007(b)**

38. Pursuant to Local Rule 1007-2(a)(3), no committee of unsecured creditors was organized prior to the petition date.

39. Pursuant to Local Rule 1007-2(a)(4), annexed hereto as Exhibit A is a list containing the names of the holders of the Debtors twenty (20) largest unsecured creditors, excluding insiders.

40. Pursuant to Local Rule 1007-2(a)(5), annexed hereto as Exhibit B is a list containing the names of the holders of the Debtor's five (5) largest secured claims.

41. Pursuant to Local Rule 1007-2(a)(6), annexed hereto as Exhibit C is an estimated, unaudited balance sheet, showing the Debtor's assets and liabilities as of October 31, 2010, to the best of its knowledge. The current general partner was not the general partner on October 31, 2010, and is still attempting to reconcile the numbers.

42. Pursuant to Local Rule 2007-2(a)(7), the Debtor does not have any publicly held shares.

43. Pursuant to Local Rule 1007-2(a)(8), there is no property of the Debtor in the possession or custody of any public officer, receiver, trustee, pledgee, assignee of rents, liquidators, secured creditors, or agents of such person.

44. Pursuant to Local Rule 1007-2(a)(9), the Debtor owns the Property as described above.

45. Pursuant to Local Rules 1007-2(a)(10), the Debtor's books and records are kept at the offices of the general partner, 114 W. 47th St., New York, NY 10036-1508. The previous general partner may still have some books and records that have not been turned over to the present general partner.

46. Pursuant to Local Rule 1007-2(a)(11), the Debtor is a party to litigation pending before the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County, Florida, Civil Division, encaptioned *The Carlisle Apartments, LP v. Compass Bank*, Case No. 10-19147. Further, the Debtor's management is currently being determined by litigation in the District Court for the Southern District of New York encaptioned *RECAP Investments XI-Fund A, L.P. et al v. McCullough Harris LLC*, Case No. 1:10-cv-08612-VM. The partners of the Debtor are also involved in a litigation in the District Court for the Western District of North Carolina, Charlotte Division, encaptioned *McCullough Harris, LLC v. RECAP Investments XI-Fund A, L.P., et al.*, Case No. 3:10-cv-0619-GCM. In this action, which Carlisle Limited Partner and Carlisle GP have sought to have dismissed, stayed, or transferred to the Southern District of New York, McCullough Harris has challenged Carlisle GP's rights to act as the general partner of the Debtor.

47. Pursuant to Local Rule 1007(a)(12), the Debtor intends that it will continue to be managed by its general partner, Carlisle GP, Inc., but this is the subject of the ongoing litigation set forth in the preceding paragraph.

48. Pursuant to Local Rule 1007-2(b)(1), the Debtor has no employees, but reimburses the property manager for the cost of its employees who work at the Property.

49. Pursuant to Local Rule 1007-2(b)(2), subject to approval by the Court, the Debtor estimates that in the thirty (30) day period following the petition date, the Debtor will pay Gordian Group fifty-thousand dollars ($50,000).

50. Pursuant to Local Rule 1007-2(b)(3), annexed hereto as Exhibit D is a budget covering the thirteen week period following the petition date indicating receipts and disbursements.

51. The Debtor intends to continue in the operation of its business and propose a plan of reorganization, which treats all creditors and parties in interest in a fair and equitable manner consistent with the provisions of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on December 27, 2010

_____
Marc Schulder

NEWYORK/135802.1