Hearing Date and Time: July 7, 2011 at 10:00 a.m. (Eastern Time)
Objection Date and Time: June 29, 2011 at 4:00 p.m (Eastern Time)

Sandra E. Mayerson (SEM-8119)
Peter A. Zisser (PZ-9634)
Squire, Sanders & Dempsey (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: +1.212.872.9800
Facsimile: +1.212.872.9815

Counsel to Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
In re:                                           :    Chapter 11
                                                 :
The Carlisle Apartments, L.P.,                   :    Case No. 10-16805 (SMB)
                                                 :
                        Debtor.                  :
---------------------------------------------------------x

### DEBTOR'S MOTION FOR ORDER (I) APPROVING SETTLEMENT UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019(A), AND (II) AUTHORIZING DEBTOR TO OBTAIN FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362 AND 364 TO CONSUMMATE SETTLEMENT

The Carlisle Apartments, L.P. (the "Debtor"), debtor and debtor-in-possession in the above-captioned case (the "Case"), hereby moves this Court (this "Motion") for an order: (i) approving the terms of a settlement (the "Settlement"), pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), by and among the following parties (individually, a "Party" and collectively, the "Parties"): Debtor, RECAP Investments XI - Fund A, L.P. ("RECAP A"), and RECAP Investments XI – Fund B, L.P. ("RECAP B" and, together with RECAP A, "RECAP"), on the one hand, and Compass Bank (the "Bank"), on the other hand; and (ii) authorizing Debtor to (a) obtain $28,500,000 in post-petition financing from NXT Capital LLC ("NXT") in order to consummate the Settlement, (b) execute and deliver the credit agreement and related loan documents (the "Loan Documents"), (c) grant to NXT a first priority

deed of trust on Debtor's property known as Phillips University Center, a 372-unit, garden style apartment complex in Charlotte, North Carolina (the "Property"), (d) authorizing the consensual use of cash collateral; and (e) modifying the automatic stay imposed by 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms of the Loan Documents. In support of this Motion, Debtor states the following:

## PRELIMINARY STATEMENT

1. The Settlement between Debtor, RECAP and the Bank provides the means by which Debtor can extinguish all obligations between Debtor and the Bank, including its Note (defined below) and concomitant swap obligation owing from Debtor to the Bank, at a discount of approximately ten percent (10%), which provides Debtor with significant savings. A true and correct copy of the Terms of Understanding and Exhibit A thereto is attached hereto as <u>Exhibit 1</u>.[1] In order to consummate the Settlement, Debtor has obtained a term sheet for exit financing from NXT, such that Debtor's new lender will be NXT, and NXT will then hold a first priority deed of trust on the Project. All obligations by and between Debtor, RECAP and the Bank will be deemed satisfied.

2. Debtor believes that the Settlement represents a significant step toward bringing this Case to a prompt conclusion and that it exercised its prudent business judgment by entering into the Settlement to satisfy Debtor's obligations to the Bank for a discounted amount of approximately ten percent (10%). The Settlement is a fair and equitable resolution of the Parties' relationship and is in the best interests of the Parties, Debtor's estate and its creditors.

---

[1] This description does not take the place of the Terms of Understanding, which should be read in its entirety. In case of a discrepancy between Exhibit 1 and this description, Exhibit 1 shall control. The Deposit Agreement is not included in Exhibit 1, as it is a private agreement among three non-Debtor parties. Similarly, in any discrepancy between this description and the loan documents ultimately executed by Debtor, the loan documents will govern.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this Case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. The Court has entered an order that venue is appropriate in this District.

5. The statutory bases for the relief requested herein are 105(a), 362 and 364 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 4001 and 9019(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

## BACKGROUND

6. Debtor was formed on or about January 2, 2008, pursuant to that certain Limited Partnership Agreement of Debtor (the "LPA") by and among McCullough Harris, LLC, a North Carolina limited liability company ("McCullough Harris") and RECAP. Pursuant to the LPA, RECAP was the initial limited partner of Debtor and McCullough Harris was the initial general partner of Debtor. The purpose of Debtor was to develop and own the Property.

7. On January 2, 2008, Debtor and the Bank entered into the Construction Loan Agreement (the "Original Loan Agreement") and related Note (the "Note"), which Note is secured by a first priority deed of trust on the Property (the "Mortgage"), whereby the Bank provided a loan in the principal amount of $32,400,000 (the "Loan") to Debtor in order to finance the acquisition of the Property and to construct certain improvements thereon. Donald E. Phillips ("Phillips") is a guarantor of Debtor's obligations under the Original Loan Agreement.

8. The original Loan matured in January, 2011 (the "Maturity Date"). The amount currently due and owing for principal and interest under the Note is $32,080,675.07. Debtor has stipulated in the cash collateral order that it has no defenses to this amount. In addition, the Bank

asserts that an additional amount of approximately $75,000 is owed under the Note as soft costs pursuant to the terms thereof. Finally, on or about January 15, 2008, Debtor entered into an interest rate swap (the "Swap Obligation") with respect to the Note which is also secured by the Mortgage. Debtor has been paying the Bank approximately $67,000 monthly in respect of the Swap Obligation. As of June 13, 2011, the Bank asserts that the breakage fees to extinguish the swap liability is $517,225. Thus, the Bank asserts that Debtor currently owes the Bank approximately $32,672,729 secured by the Mortgage. All obligations whatsoever owing to the Bank from Debtor under the Original Loan Agreement, the Note, the Mortgage, the Swap Obligation and any other documents related to the Property, whether secured or unsecured, are, herein, the "Obligations".

9. In November, 2010, RECAP removed McCullough Harris as general partner of Debtor and replaced it with Carlisle GP, Inc. ("Carlisle GP"). As a result of this action, RECAP became an additional guarantor of the Obligations.

10. Carlisle GP continued to attempt negotiations with the Bank for an extension of the Obligations. Eventually, the Bank issued a formal proposal to Carlisle GP to restructure the Obligations. On December 22, 2010, the Bank informed Carlisle GP that the Note had to be paid in full on or before the Maturity Date, and on December 23, 2010, Carlisle GP was informed by the Bank that the Bank intended to sell the Note if the proposed buyer could pay the agreed price by year end. As a result, the Bank was not interested in further discussion about restructuring the Obligations.

11. In the meantime, Carlisle GP learned that McCullough Harris and Phillips continued to control Debtor's bank accounts held at the Bank. Faced with: (i) the real threat that Phillips and McCullough Harris may drain Debtor's cash resources, (ii) the Note coming due

imminently, and (iii) no counterparty willing to negotiate, Carlisle GP and Debtor determined that filing for relief under chapter 11 of the Bankruptcy Code was the only viable option to preserve the value of the Property, prevent foreclosure, and maximize value for all stakeholders.[2]

12. On December 27, 2010 (the "Petition Date"), Debtor commenced its reorganization Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

13. Debtor is continuing in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

14. No trustee or statutory committee has been appointed in this Case.

## TERMS OF THE SETTLEMENT

15. In the interest of moving this Case toward resolution, the Parties have agreed to enter into the Settlement. In summary, the Parties have agreed to the following:

16. **Settlement Terms**

    a. ***Transaction Price and Contingencies***. The Bank will extinguish all of the Debtor's Obligations for a payment of $30 million (the "Transaction").[3] The Bank's obligation to extinguish the Obligations is contingent upon, *inter alia*, the Transaction being consummated no later than forty-five (45) days from the date of this Motion, except as such period may be extended pursuant to Paragraph 16(e) below, and the Deposit (defined below) being provided by RECAP, as described in greater detail in Paragraph 16(e) below. Debtor will also pay a pre-petition swap obligation owed to the Bank at closing in the amount of $26,382.06.

    b. ***Releases***. At the closing of the Transaction, Debtor and RECAP, on the one hand, and the Bank, on the other hand, will exchange mutual releases releasing one another from any and all liabilities in respect of Debtor, including a release of the guarantee obligations of RECAP.

---

[2] The Bank does not acknowledge the accuracy of Debtor's characterization of the Bank's pre-petition actions and reserves all rights related thereto.

[3] During this Case, Debtor has provided the Bank with $125,000 per month in adequate protection payments (the "Monthly Payments"), which accrues and is due on the fifteenth (15th) day of each month for the following month. For the avoidance of doubt, all Monthly Payments which come due prior to the closing of the Transaction will be timely paid, and further, nothing in this Motion or the Order thereon shall be construed to absolve Debtor of any obligations owing to the Bank prior to the closing of the Transaction.

c. ***Deposit***. On or prior to the date of the filing of this Motion, RECAP and the Bank shall enter into a Deposit Agreement, upon execution of which RECAP will provide to the Bank a $2 million non-refundable deposit (the "Deposit"),[4] which Deposit is intended to be outside of the jurisdiction of the Bankruptcy Court as it is being provided by a non-debtor entity and not from Debtor's estate. The following terms and conditions apply to the Deposit:

- If the Transaction is consummated within forty-five days of the date of the filing of this Motion or within permitted extensions (the "Outside Date"), the Deposit and any interest earned thereon will be applied to the $30 million transaction price (the "Transaction Price");

- If the Transaction is not consummated on or before the Outside Date, then on the day following the Outside Date, and *provided that* the Bank did not default on its obligation to consummate the Transaction, the Bank shall apply the Deposit and any interest earned thereon to the principal outstanding under the Note, and Debtor's interest payments will be reduced accordingly;

- If the Transaction is not consummated but the Plan (as defined below) is confirmed within seventy-five (75) days of the filing of the Plan, then the Deposit and any interest earned thereon will be applied against the cash pay-down to the Bank required under the Plan (defined and discussed further in Paragraph 15(d)); and

- Notwithstanding the foregoing, if neither the Transaction nor the Plan is consummated, then the Bank may apply the Deposit and any interest earned thereon in accordance with the documents governing the Obligations and applicable law; *provided, however*, that the Bank must promptly give RECAP an accounting of how the Deposit was applied.

As part of this Motion, Debtor requests that if this Court approves this Settlement, upon either the termination of the Obligations or the consummation of the Plan (as defined below), Debtor be permitted to account for the Deposit as an equity contribution by RECAP. Until such time, however, the Deposit will remain the property of RECAP, subject to the Deposit Agreement with the Bank.

d. ***Plan of Reorganization***. Within one week from the forty-sixth (46th) day following the date of the filing of this Motion, if the Transaction has not been consummated, Debtor shall file a plan of reorganization and accompanying disclosure statement containing the terms set forth in Exhibit A to the Terms of Understanding or such other terms as may be mutually agreed between the Bank and Debtor (the "Plan"). The Bank agrees to support confirmation of the Plan for a period of seventy-five (75)

---

[4] In addition to the Deposit, RECAP will also provide as required additional equity contributions, which will be used to close the Transaction, pay the various fees and expenses associated with the Financing (defined below), and pay professional fees and exit bankruptcy, whether through a Plan (defined below) or a dismissal of the Case.

days from the date of the filing of the Plan, but thereafter shall have no obligation to do so. From the date of the filing of the Plan, and without regard to the status of the Transaction, Debtor shall pursue confirmation of the Plan in good faith. If the Transaction is consummated prior to the date set for a hearing on confirmation of the Plan, then Debtor may withdraw or amend the Plan.

    e. **_Extensions of the Closing Date_**. If the Transaction has not been consummated by Outside Date, and *provided*, that Debtor has filed the Plan as set forth in Paragraph 15(d) herein, at the option of the Bank, the Outside Date shall be extended for two (2) weeks (but not later than fifty-nine days from the filing of this Motion), *provided that* RECAP shall provide to the Bank an additional non-refundable deposit of two hundred fifty thousand ($250,000) dollars (the "Additional Deposit"). The Additional Deposit shall be treated by the Bank in the same manner as the Deposit, as set forth in Paragraph 16(c) above. Thereafter, the Bank, at its sole option, and upon the request of Debtor, may grant additional one week extensions of the Outside Date, and for each such extension, the Transaction Price shall increase one hundred thousand dollars ($100,000).

    f. **_Expenses_**. If, and only if, the Transaction is consummated, Debtor and/or RECAP shall reimburse the Bank for its reasonable expenses, including attorney fees, related solely to the Transaction, up to a maximum amount of seventy-five thousand ($75,000) dollars (the "Expenses"). The Expenses shall be paid at the closing of the Transaction, upon receipt of appropriate documentation, or such later date as documentation is received.

## TERMS OF NEW FINANCING

17. In order to obtain the monies needed to satisfy the Transaction Price and thereby consummate the Transaction, Debtor has received an indication of financing from NXT. The terms of the financing are set forth below.

### *Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement*

18. Material provisions of the financing offer from NXT (the "Financing") are described below and set out in the proposed Order hereon, pursuant to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) (relating to obtaining credit) and Local Rule 4001-2(a)-(b) (relating to obtaining credit). A true and correct copy of the term sheet from NXT is attached hereto as Exhibit 2.[5]

---

[5] The term sheet is not a commitment to make a loan, but Debtor feels confident that the loan will be available on terms substantially similar to the term sheet and seeks authority to consummate a financing on substantially similar

19. **_Deal Terms_**

- Borrower: Debtor is the borrower under the proposed Financing.

- Loan Amount: The Loan Amount is $28,500,000.

- Application Fee: A $15,000 application fee, plus a $100,000 good faith deposit, is required with submission of the loan application. RECAP has advanced these sums as an equity contribution to Debtor.

- Closing Date: June 27, 2011, or such later date as the financing has been approved by this Court, but no later than 120 days after delivery of the term sheet to Debtor on June __, 2011.

- Security: The Loan, Exit Fee and all other amounts due to the Lender under the Loan Documents will be secured by a perfected first lien on the Property, all leases and rents, all personal property, fixtures, accounts, inventory, receivables, machinery, equipment and proceeds, all contract rights, licenses and permits now and hereafter existing, and a pledge of all escrow and reserve accounts.

- Loan Fee: The Loan Fee is 1.25% of the Loan Amount.

- Term: The term is three (3) years, with one twelve (12) month extension option available, *provided that*: (i) Borrower has delivered to Lender written notice of such election no earlier than 120 days and no later than 90 days prior to the then current Maturity Date; (ii) a 0.50% extension fee is paid; (iii) Lender shall have received Borrower's and each Guarantor's most recent financial statements in the form approved by Lender, certified as complete and correct by Borrower and Guarantors, and there must be no Material Adverse Change in Borrower's or Guarantor's financial condition; (iv) Project Yield is equal to or greater than 8.5%; and (v) and the loan has not been in default, *provided, that,* the Lender shall permit one non-monetary Event of Default to have occurred and been subsequently cured during the initial loan term.

- Interest Rate: A rate equal to a floating rate per annum equal to the aggregate of four percent (4.00%) plus the Base Rate, but in no event shall the Interest Rate be lower than six and three quarters percent (6.75%); *provided, however*, that so long as Borrower remains in bankruptcy, the Interest Rate shall be seven and one-half percent (7.50%).

- Prepayment: The loan is prepayable at any time, subject to NXT having received a minimum of twelve months' interest.

---

terms to the term sheet. Debtor undertakes to file with this Court and serve a copy of the actual loan documents for which it seeks authority no less than three (3) days in advance of the hearing.

- Exit Fee: The Exit Fee is due upon repayment in whole of the Loan, whether at maturity, upon prepayment, upon acceleration or otherwise. During the first forty-eight (48) months, the Exit Fee due is equal to the sum of (a) $427,500 or 1.5% of the total Loan Amount and (b) any positive difference between $1,923,750 (12 months minimum interest) and interest actually paid to Lender; *provided, that*, in the event it takes longer than 90 days from the Closing Date for the Borrower to exit bankruptcy, an additional fee of $142,500 (0.5% of the Loan Amount) is added to the Exit Fee. If it takes Debtor longer than 150 days from the Closing Date to exit bankruptcy, another additional $142,500 is added to the Exit Fee. The Exit Fee shall be due whether or not there are sufficient funds generated from the Property or from Net Proceeds to pay the Exit Fee.

- Amortization: The loan is interest-only until the maturity date.

- Guarantors: RECAP is a guarantor under the loan, and will collectively maintain a net worth of at least $10 million. Guarantors shall be joint and severally responsible for all debt service payments due to Lender pursuant to a debt service guarantee, and shall be jointly and severally responsible for the top (first loss) 10% of the Loan Amount, up to $2,850,000. NXT will release the Guarantors from the top loss recourse and debt service guaranty in the event all of the following conditions have been satisfied: (i) Lender has obtained (at Borrowers request and expense) an appraisal showing a maximum loan to value of 75%; (ii) Project Yield must be equal to or greater than 8.5%; (iii) the Project must achieve a greater than 1.25x debt service coverage ratio; and (iv) the Borrower has paid to Lender a fee equal to 0.50% of the Loan Amount.

- Fees and Reimbursement of Expenses: Borrower or Debtor shall repay Lender for all reasonable costs and expenses relating to the Loan and the closing thereof, whether or not the Loan is funded or this transaction is ever consummated. There is a Loan Fee of 1.25% of the principal amount.

- Termination Events: Customary.

- Events of Default: Customary.

- Additional Covenants: The following are additional conditions to closing which must be satisfied (in Lender's sole discretion) relating to the Borrower's Case, in the event the Case is not dismissed prior to closing: (i) the loan shall be approved by a final, non-appealable order of the bankruptcy court, in form and substance acceptable to Lender, with all the priorities and rights typically afforded to a 3rd party lender providing new financing to a debtor-in-possession and providing for use of cash collateral on terms acceptable to lender; (ii) Debtor's Case shall not be converted to a chapter 7, nor shall a trustee or examiner have been appointed; (iii) within 7 days of the Closing, Debtor shall file a motion to dismiss the Case, in form and substance

acceptable to Lender, and an order shall be entered dismissing the case within sixty days, or Debtor shall file a plan or reorganization, in form and substance acceptable to Lender, which Plan is confirmed within 180 days of the loan closing; and (iv) Debtor must adopt the new financing without modification in any plan of reorganization.

- **Waiver of Automatic Stay**: The automatic stay under 11 U.S.C. § 362 shall be modified only to permit Debtor and NXT to perform all acts, execute all instruments and documents, and pay all fees, that may be required for the performance of their obligations under the Loan Documents.

## RELIEF REQUESTED AND BASIS FOR RELIEF

### A. *Settlement With the Bank*

20. By this Motion, Debtor respectfully requests entry of an Order or Orders: (a) approving the terms of the Settlement as a fair and equitable resolution of the obligations by and between the Parties pursuant to Bankruptcy Rule 9019(a); (b) authorizing Debtor to (i) obtain $28,500,000 in postpetition financing from NXT in order to consummate the Settlement, (ii) execute and deliver the Loan Documents, (iii) grant to NXT a first priority deed of trust on the Property pursuant to 11 U.S.C. §§ 364(c); (c) authorizing the use of cash collateral in the ordinary course of Debtor's business so long as Debtor complies with the NXT loan documents; and (d) modifying the automatic stay imposed by section 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms of the Loan Documents and the Settlement.

21. Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. Proc. 9019(a). Courts have "broad authority to approve compromises and settlements" under Bankruptcy Rule 9019(a), and "[c]ompromises are favored by the Courts ... because they allow the estate to avoid the expenses and burdens associated with litigating contested claims." *In re Drexel Burnham Lambert Group*, 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992) (internal citations omitted).

22. Courts in the Second Circuit will generally approve settlements that are "fair and equitable," and, accordingly, have developed certain interrelated factors for evaluating whether settlements meet that standard. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. N.Y. 2007). Those factors may include:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.* (citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006), with other citations omitted).

23. The balance of the foregoing factors clearly weighs in favor of approving the Settlement. It is clearly in Debtor's best interests, and the best interests of its estate and creditors, to satisfy the Obligations for a Transaction Price that is approximately ten percent (10%) less than the full amount owing under the Obligations. Additionally, each of the Parties has agreed to provide mutual releases to each other, which eliminates the risk of future litigation between the Parties on account of the Obligations or any other actions taken by any of the Parties prior to or during the Case. Also, Debtor is getting the benefit of a $3 million plus equity contribution from its equity owners in order to consummate the Transaction or a plan of reorganization. Although RECAP is getting a release from Debtor and the Bank in return, all creditors will benefit from RECAP's equity contribution. Finally, the Settlement provides a definitive exit strategy for this

Case. If the Transaction does not close for any reason, a plan of reorganization is already pre-negotiated which has the support of the secured lenders. All stakeholders should benefit by the quick resolution of this Case mandated by the Settlement. Under the circumstances, Debtor believes that the Settlement is fair and reasonable. The Settlement is the result of arm's length bargaining among the Parties.

B. ***Financing to Consummate the Settlement**

24. As noted above, Debtor must obtain the Financing in order to consummate the Transaction.

25. Carlisle GP approached numerous sources for new financing and to provide funds to satisfy the Obligations. However, few lenders were willing to loan funds to a property that had not been leased up for a year. Additionally, Carlisle GP has worked with NXT in the past and due primarily to that prior relationship, NXT was willing to negotiate with Debtor.

26. Debtor, RECAP, and NXT have engaged in good faith, extensive, arm's-length negotiations with respect to the terms and provisions of the proposed Financing. Significantly, the Financing will provide Debtor with the necessary funds to consummate the Transaction and be released from the Obligations, at a significant discount. The Financing is also beneficial to Debtor, and in Debtor's best interest, because the proposed interest rate is a market rate of interest, and it is up to a four year loan, which provides the Property an opportunity to stabilize and for the real estate market to turn around so that, ultimately, the full potential of the Property can be achieved. The Property has only been fully rented for two months, and Debtor has been unable to obtain any other offer for four-year financing under these circumstances. The existing lender would not voluntarily restructure its existing debt into a four year loan, as evidenced by Exhibit A.

27. Section 364(c) of the Bankruptcy Code provides, *inter alia*, that if a debtor is unable to obtain unsecured financing allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize Debtor to obtain credit or incur debt secured by a lien on property of the estate that is not otherwise subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code provides that a debtor may obtain financing secured by a senior lien on property of the estate if Debtor is otherwise unable to obtain financing and the current lien holder's interest in the property is adequately protected. 11 U.S.C. § 364(d).

28. In this instance, the proceeds from the Financing are being utilized to satisfy all known liens against the Property, including the lien of the Bank. NXT will receive a lien on the Property, which upon the closing of the Transaction will be unencumbered by any other known lien. Out of an abundance of caution, and to protect NXT during the time period from their wiring of the monies to the Bank, to the Bank's receipt of such funds and the recording of the release and satisfaction from the Bank, Debtor seeks to obtain the Financing pursuant to both 11 U.S.C. §§ 364(c) and (d). To adequately protect the Bank, Debtor is seeking an order directing that $28 million of the proceeds of the NXT loan be wired directly to the Bank at closing. Debtor asserts that the Bank is adequately protected by this arrangement, and that it could not obtain financing absent a first priority lien pursuant to 364(c) and 364(d).

29. Despite its best efforts, Debtor has not been able to obtain financing to satisfy the Obligations to the Bank from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

30. Having determined that financing is only available under 11 U.S.C. §§ 364(c) and (d) of the Bankruptcy Code, Debtor negotiated with NXT extensively, in good faith and at arm's-

length. Provided that a debtor's judgment in choosing its financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g. In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

31. The terms and conditions of the financing are reasonable and fair, offer Debtor a stable, long-term solution to Debtor's liquidity issues, and will allow Debtor to bridge the gap between today and the time when the value of the Property will be maximized. The proposed financing also mandates a rapid exit from bankruptcy, which should be in the interests of all creditors. Accordingly, consummation of the Settlement with funds provided by the Financing is in the best interests of Debtor's estate, its creditors and all parties in interest, and is consistent with Debtor's exercise of its fiduciary duty.

32. The current cash collateral order under which Debtor is operating [Doc. No. 94] reflects a consensual agreement with the Bank. If the Transaction is consummated, the Bank will be satisfied in full, and thus, the existing cash collateral order will no longer be pertinent. NXT has agreed that so long as Debtor is in compliance with both the loan documents with NXT and the terms of any order entered by the Court in response to this Motion, Debtor may use the NXT cash collateral to operate in the ordinary course. By this Motion, Debtor requests authority to use NXT's cash collateral to conducts its business in the ordinary course.

33. Additionally, the relief requested herein contemplates a modification of the automatic stay (to the extent applicable) only to permit Debtor to: (i) grant the Deed of Trust on

the Property with respect to NXT and to perform such acts as may be requested to assure the perfection and priority of such Deed of Trust; and (ii) implement the terms of the Order.

34. Stay modifications of this limited nature are ordinary and standard features of post-petition debtor financing arrangements, and in Debtor's business judgment, are appropriate under the circumstances set forth herein.

## NOTICE

35. Notice of this Motion has been served on (i) the Office of the United States Trustee; (ii) counsel to the Bank; (iii) counsel to NXT; and (iv) all parties that have requested special notice pursuant to Bankruptcy Rule 2002. Debtor submits that, under the circumstances, no other or further notice is necessary.

## NO PRIOR REQUEST

36. Debtor has not previously sought the relief requested herein from this or any other Court.

[Balance of this page intentionally left blank]

## CONCLUSION

**WHEREFORE,** Debtor respectfully requests that this Court: (i) enter an order or orders, granting the relief requested herein and (ii) grant such other and further relief as may be just and proper.[6]

Dated: New York, New York
       June 13, 2011

                              Respectfully submitted,

                              SQUIRE, SANDERS & DEMPSEY (US) LLP

                              By: /s/Sandra E. Mayerson
                                  Sandra E. Mayerson (SEM-8119)
                                  Peter A. Zisser (PZ-9634)
                              30 Rockefeller Plaza
                              New York, NY 10112
                              Telephone: (212) 872-9800
                              Facsimile: (212) 872-9815
                              Email: sandy.mayerson@ssd.com
                              Email: peter.zisser@ssd.com

                              COUNSEL TO DEBTOR AND
                              DEBTOR-IN-POSSESSION

---

[6] Debtor is working on a consensual form of order with the Bank and NXT and will file and serve the proposed order or orders in advance of the hearing.