# **EXHIBIT 1**

Terms of Understanding

By execution of this document, the parties hereto indicate their agreement to the following terms to be embodied in a Motion to Approve Settlement and Obtain Financing (the "Motion") to be filed with the Bankruptcy Court ("Bankruptcy Court") presiding over the chapter 11 of The Carlisle Apartments, L.P. (the "Case"). RECAP Investments XI – Fund A, L.P.; RECAP Investments XI – Fund B, L.P. (together referred to as "RECAP"); and Compass Bank ("Compass," or "the Bank") will not be bound by the terms hereof unless and until the Motion is filed with the Bankruptcy Court encompassing these terms in form and substance agreeable to RECAP and the Bank. RECAP and the Bank acknowledge that The Carlisle Apartments, L.P. (the "Debtor") is not bound by the terms hereof unless and until the Motion is approved by the Bankruptcy Court.

The Motion, which will be filed within five (5) business days after execution of this document, or such later date as the parties may agree, will include the following terms:

1. Compass will accept in full and final satisfaction of all outstanding obligations between the Debtor and Compass, (the "Obligations"), including that certain note collateralized by a first mortgage on the Debtor's property and the concomitant swap obligations, $30 million. All Obligations will be extinguished upon payment of $30 million. The Bank will execute and deliver to Debtor a satisfaction of mortgage and such other documents reasonably required by Debtor to evidence the termination of the Obligations. The Bank or Debtor may provide a form of Debt Satisfaction Agreement to be included as an Exhibit to the Motion.

2. In addition, the parties hereto (the "Parties") acknowledge that the Debtor pays Compass $125,000 a month in adequate protection payments during the pendency of the Case (the "Monthly Payments"). Each Monthly Payment accrues and is due on the fifteenth (15th) of each month for the following month. All Monthly Payments which come due prior to the closing of the Transaction (as defined below) will be paid timely.

3. The Parties acknowledge that Twenty-six thousand three hundred eighty-two dollars and six cents ($26,382.06) is owed to the Bank pre-petition for a missed payment on the swap obligation (the "Swap Payment"). In addition to any other consideration set forth herein, the Debtor will pay the outstanding Swap Payment prior to or at the closing of the Transaction.

4. The Bank's obligation to complete the transaction contemplated in paragraph 1 (the "Transaction") is conditioned upon the following:

   (i) the Motion contains a letter from NXT Capital, LLC, or an affiliate thereof demonstrating the Debtor has financing in prospect to complete the Transaction;

   (ii) the Transaction is consummated no later than forty-five (45) days from the date the Motion is filed with the Bankruptcy Court, except as such period may be extended pursuant to paragraph 4 below;

   (iii) RECAP shall provide to the Bank a $2 million non-refundable cash deposit as set forth in more detail in paragraph 5 below;

(iv) the Monthly Payments are up-to-date as of the date of the closing of the Transaction, and

(v) the Swap Payment is paid at or prior to the closing of the Transaction.

5. On the forty-sixth (46th) day following the filing of the Motion with the Bankruptcy Court, if the Transaction has not been consummated, then within seven (7) days thereafter, the Debtor will file a plan of reorganization and accompanying disclosure statement containing the terms set forth in Exhibit A hereto (the "Plan"). The Bank agrees to support confirmation of the Plan for a period of seventy-five (75) days from its filing, but shall have no obligation to do so thereafter. The Debtor may represent in the Plan and to the Court that the Bank consents to the Plan provided it is confirmed within seventy-five (75) days.

6. If the Transaction has not been consummated at the end of the forty-fifth (45th) day following the date the Motion is filed, and provided, the Debtor has filed the Plan as set forth in paragraph 3 above, at the option of the Bank, the time for consummating the Transaction will be extended for two (2) weeks (but not later than fifty-nine days from the filing of the Motion) upon RECAP paying the Bank an additional non-refundable cash deposit of two hundred fifty thousand ($250,000) dollars. The $250,000 deposit will be treated the same as the initial $2 million deposit. Thereafter, the Bank, at its sole option, upon the request of the Debtor, may choose to grant additional extensions in one week increments. For each one week extension requested and granted, the purchase price of the Obligations will be increased by one hundred thousand ($100,000) dollars.

7. On or prior to the date the Motion is filed (the "Motion Date"), RECAP and the Bank will enter into the Deposit Agreement attached hereto as Exhibit B which provides that the Bank will hold RECAP's non-refundable deposit at the Bank, and that:

(i) if the Transaction is consummated within forty-five (45) days of the Motion Date, or within permitted extensions, the deposit and any interest earned thereon referred to in paragraph 2(iii) above will be applied to the purchase price;

(ii) if the Transaction is not consummated within such time, the deposit and any interest earned thereon will be promptly applied by the Bank to the outstanding principal under the Note, and the Debtor's interest payments will be reduced accordingly;

(iii) if the Transaction is not consummated but the Plan is confirmed within seventy-five (75) days of its filing, then the deposit and any interest earned thereon will reduce the cash paydown to the Bank required under the Plan;

(iv) notwithstanding the foregoing, if neither the Transaction nor the Plan is consummated, then the Bank may apply the deposit and any interest earned thereon in accordance with the documents governing the Obligations and applicable law; provided, however, that Bank must promptly give RECAP an accounting of how the deposit was applied; and

(v) in no event will the Bank be required to refund the deposit unless the Bank itself defaults on its obligations to consummate the Transaction.

Upon executing the Deposit Agreement, RECAP will deposit $2 million with the Bank, which will hold said deposit (and any amount added thereto, including interest earned thereon) in accordance with the terms of the Deposit Agreement. It is the intention of the parties hereto that both the Deposit Agreement and the provisions herein related to the deposit are separate contractual obligations between non-debtors (*i.e.*, the Bank and RECAP), and as such, are outside the jurisdiction of the Bankruptcy Court. RECAP represents and warrants that no portion of the deposit derives in any way from the funds or assets of the Debtor.

8. If, and only if, the Transaction is consummated, the Debtor and/or RECAP will pay in addition to any other consideration required herein the reasonable expenses, including legal fees, of the Bank related solely to this Transaction up to a maximum of seventy-five thousand ($75,000) dollars. Such expenses will be paid at the closing of the Transaction upon receipt of appropriate documentation, or upon such later date as the documentation is received.

9. At the closing of the Transaction, RECAP and the Debtor, on the one hand, and the Bank on the other hand, will exchange broad, mutual releases releasing one another from any and all liabilities in respect of the Debtor. Said releases will include a release of the guarantee of RECAP to Compass. In addition, the Parties acknowledge that the Debtor has received the releases from Donald Phillips and his related parties attached hereto as Exhibit C and that Phillips has dismissed his lawsuit against Compass with prejudice. A copy of said dismissal is attached hereto as Exhibit D.

10. From the date the Plan is filed, even if the Debtor continues to seek to close the Transaction as permitted herein, the Debtor must in good faith pursue confirmation of the Plan. If the Transaction is consummated prior to the date set for a hearing on confirmation of the Plan, then the Debtor may withdraw or modify the Plan.

11. The Debtor has caused the *Lis Pendens* on the property owned by the Partnership to be released. A copy of such dismissal is attached hereto as Exhibit E.

12. Except as expressly set forth herein, all parties reserve all of their rights and remedies.

Executed this 7 day of ~~May~~ June, 2011.

The Carlisle Apartments, L.P.
Debtor and Debtor-in-Possession

By: Carlisle GP, Inc.
It Sole General Partner

By: _/s/ Karin Shewer_
    Name: KARIN SHEWER
    Its: President


RECAP Investments XI - Fund A, L.P.

By: RECAP XI GP, Inc.
    Its Sole General Partner

By: _/s/ Karin Shewer_
    Name: KARIN SHEWER
    Its: President


RECAP Investments XI - Fund B, L.P.

By: RECAP XI GP, Inc.,
    Its Sole General Partner

By: _/s/ Karin Shewer_
    Name: KARIN SHEWER
    Its: President


Compass Bank
By: _/s/ James J. Johnson_
    Name: James J. Johnson
    Its: SVP

## Exhibit A

## Agreed Plan

If a closing does not occur on the Transaction terminating the Note and swap obligations prior to the Outside Date,[1] Debtor agrees to file the Agreed Plan within one week after the Outside Date which will contain the following restructuring of Debtor's obligations to the Bank, or such other terms as the Parties may agree:

**Borrower:** The Carlisle Apartments, LP, a single-asset entity controlled by Real Estate Capital Partners ("RECAP"). RECAP or an entity controlled by RECAP will act as the General Partner of the Borrower.

**Purpose:** Extension and modification of the Bank's existing loan, secured by a 372-unit multi-family development known as "University Center Apartments" ("Project") and located at 701 McCullough Drive, Charlotte, NC 28262.

**Guarantor:** RECAP Investments XI – Fund A, LP and RECAP Investments XI – Fund B, LP will continue to provide a full payment and performance guaranty for the referenced loan, including interest, swap exposure and standard carve-out covenants.

**Guarantor Burn-Down Provisions:** Recourse for loan principal shall reduce to 50% of the committed loan balance upon the following: (a) no default, and (b) the Collateral achieves a 1.10x DCR based on the trailing 12-month NOI and a loan constant based on the 7-year Treasury Rate plus 3.25% (subject to a minimum 6% rate) and a 30-year amortization. Recourse for loan principal will be released altogether upon the following: (a) no default, and (b) the Collateral achieves a 1.25x DCR based on the same calculations noted above. Guarantor to remain liable for interest and standard carve-out covenants in any event.

**Financial Covenants on Guarantor:** Guarantor will be required to maintain on an aggregate basis a $30MM tangible net worth, tested semi-annually, with the first test occurring on June 30, 2011.

---

[1] "**Outside Date**" shall have the definition provided in footnote 1 to the Advance Deposit Payment Agreement.

| | |
|---|---|
| **Proposed Loan Commitment:** | $27,018,810. The Proposed Loan Commitment is calculated based upon the current balance of $32,018,810, less a required $5,000,000 principal reduction, approximately $2 million of which will be paid by application of the Deposit, and approximately $3 million of which will be paid in cash on the Effective Date of the Agreed Plan. No more advances will be made under the Loan. |
| **Term:** | Two-year primary term from the date the court confirms the Agreed Plan, with a maturity date not later than July 1, 2013, with one (1) 12-month extension option (defined below). No further funds will be advanced. |
| **Extension Conditions:** | 12-month extension option will be conditioned upon: |

(i) Written notification to Bank within 30 days prior to maturity;

(ii) Payment of extension fee;

(iii) No event of default or un-matured default shall have occurred and be continuing on the initial maturity date; and

(iv) Debt Coverage Ratio ("DCR") on the date of the extension request and on the date of the extension shall not be less than 1.10 to 1.00. DCR is defined as the actual trailing 12-month Net Operating Income for the Project at the time of the calculation, divided by the hypothetical annual debt payments based upon the outstanding loan amount and a loan constant derived from the 7-year Treasury Rate plus 3.25% (subject to a minimum 6% rate) and a 30-year amortization.

(v) An MAI appraisal dated no earlier than 3 months from the maturity of the loan shall reflect a maximum LTV of 75% based on the "As Is Value" of the collateral. Borrower shall have the right to reduce the loan amount to meet the test.

| | |
|---|---|
| **Performance Hurdles:** | The Project must achieve a 1.00 to 1.00 DCR at the first anniversary (or on any day within 90 days prior to the first anniversary) of the 2-year primary term. The DCR will be based on the trailing 12-month NOI and a loan constant based upon the 7-year Treasury Rate plus 3.25% (subject to a minimum 6% rate) and a 30-year amortization. Failure to comply with the performance hurdle will be an event of default. Borrower will be allowed to reduce the loan amount to satisfy the requirement. |
| **Interest Rate:** | Through January 2, 2012, the rate will be fixed at the current Swap Fixed Rate (3.75%) plus an additional 1% spread for a total fixed rate to the bank of 4.75%. Thereafter, the rate will be a floating rate based upon either LIBOR + 325 bps or Compass Base Rate + 0% as Borrower chooses from time to time. The all in rate will be subject to a Floor Rate of 4.50% beginning January 3, 2012, and increases to 5.00% during the Extension Option if elected. |
| **Fees:** | 25 bps fee for this extension, payable at closing.<br><br>25 bps extension fee for 12-month extension option payable at closing for that extension. |
| **Payments:** | Fixed monthly principal payments of $28,500 commencing in the first month of the 2-year primary term (based on a 6.0%, 30-year amortization), along with monthly interest payments based on the Interest Rate (subject to Floor Rate) through the initial 2-year primary term and the extension option. At closing of this extension, Borrower will pay the Bank any accrued interest not paid by interim payments, any swap costs not paid by interim payments, and any legal fees incurred by the Bank since December 1, 2010, an estimate of which will be provided to Borrower prior to Borrower approving this term sheet. |
| **Escrows:** | Not required unless an event of default occurs. |
| **Distributions:** | Property cash flow will be used to pay operating expenses, principal and interest, property taxes and insurance. Any excess cash flow will be allowed to be distributed to the Borrower as long as the Loan is not in default of any monetary or non-monetary covenants. |
| **Collateral:** | 1) First Lien Deed of Trust on land and improvements constructed thereon.<br>2) Assignment of rents/leases, management/construction/ architectural contracts, etc. |

| | |
|---|---|
| **Reporting:** | 1) Monthly operating statements and rent rolls, due within 30 days of month end.<br>2) Proof of real estate taxes paid.<br>3) Proof of insurance.<br>4) Complete financial statements on the Guarantor due semi-annually.<br>5) Complete financial statements on the Borrower due semi-annually. |
| **Management Fees:** | Management fees or any other fees paid to Borrower or related entity from the operations of the property shall not exceed 4% of Effective Gross Income. This is not incorporating any distributions. |
| **Other Requirements** | 1) All of the following to be acceptable to the Bank: standard for loans of this type including, but not limited to, appraisal, environmental status, legal documentation, title/survey, proposed standard lease form, condition of markets/submarkets, revenue/expenses pro-forma's and financial statements, management agreement,<br>2) Bank may order an appraisal annually or at any time the loan is in default, at Borrower's expense. Bank will provide a copy of the report to Borrower if the report is paid for by Borrower and the loan is not in default. If Bank elects to pay for the report, or the loan is in default, a copy will not be provided to Borrower.<br>3) Borrower to maintain Project operating accounts at Bank.<br>4) There shall be no restrictions limiting the Bank's ability to sell, assign or participate the subject loan, except Bank agrees not to sell the note to Don Phillips or any entity affiliated with Don Phillips.<br>5) Bank to approve in its sole and absolute discretion any cap or swap interest rate product purchased by Borrower.<br>6) At or prior to the extension closing, (a) the Borrower and RECAP as Guarantor, will execute full releases in favor of Bank related to the Project or the Carlisle loan; and (b) Borrower will incorporate this modification and all other components of this arrangement into a Chapter 11 plan of reorganization and will seek an order from the Bankruptcy Court approving of this arrangement and confirming such a plan in its entirety. |

| | |
|---|---|
| **Fees and Expenses:** | Borrower will pay all reasonable costs incurred by the Bank in connection with the loan including, but not limited to, legal, environmental, travel, front-end plan and cost review/ inspections, and appraisal. Bank will promptly provide an estimate of said costs upon execution of the Terms of Understanding. |
| **Confidentiality:** | This term sheet is strictly confidential and may not be shared with anyone else other than the owners of Borrower and Borrower's professional advisors. At such time as a term sheet has been agreed by all parties, it may be filed with the Court. |